**Dixie J. O'NEILL, Etc.,**
**Plaintiff-Appellee,**

v.

**CHURCH'S FRIED CHICKEN, INC.,**
**Defendant–Appellant.**

**Nos. 89–5611, 89–5621.**

United States Court of Appeals,
Fifth Circuit.

Aug. 30, 1990.

---

Fred Shannon and Barbara H. Nellermoe, Shannon & Weidenbach, Inc., San Antonio, Tex., Peter J. Butler, Peter J. Butler, Jr., Vincent J. Booth, Locke, Purnell, Rain & Harrell, New Orleans, La., for defendant-appellant.

Charles Estee, Shannon & Weidenbach, Inc., San Antonio, Tex., Samuel Kadet, Skadden, Arps, Slate, Meagher & From, New York City, for defendant-appellant in No. 89–5621.

Robert J. Myers, Willis, Hickey & Houghan, San Antonio, Tex., Kristi L. Browne, Frederic F. Brace, Kenneth H. Hanson, C. Timothy Smoot, Chicago, Ill., for plaintiff-appellee.

Before GARZA, GARWOOD, and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Church's Fried Chicken (Church's) appeals the district court's award of attorneys' fees to plaintiff-appellee Dixie J. O'Neill (O'Neill) pursuant to the "common fund" exception to the general American rule against such awards. O'Neill is a former shareholder of Church's, and incurred the expenses in her fight to cause the former directors of Church's (directors or board) ultimately to approve and cease to frustrate a tender offer for all of Church's stock made by Biscuit Investments, Inc. (Biscuit), a corporation owned by Alvin C. Copeland (Copeland). We affirm.

### Facts and Proceedings Below

The facts directly relevant to the issue before us are relatively straightforward and for the most part undisputed. On October 25, 1988, Biscuit announced a cash tender offer for all outstanding shares of Church's stock at eight dollars per share.[1] By its terms, the tender offer was to expire on February 19, 1989. In response, the directors determined that the offer was not in the best interests of their shareholders, recommended that the shareholders reject it, and adopted a "poison pill" device to stall the takeover attempt.[2] The board also established a "golden parachute" for sixteen senior executives of Church's, providing generous severance benefits for them upon a change in control of the corporation.

A flurry of litigation ensued in the federal and state courts of Louisiana and Texas,[3] including the instant action filed by O'Neill in the United States District Court for the Western District of Texas on November 10, 1988. In her original complaint, O'Neill alleged that the board's opposition to Biscuit's tender offer was an improper attempt at entrenchment and breached the directors' fiduciary duties of care and loyalty to Church's and its shareholders. O'Neill sought certification to pursue her action as representative of the

---

1. At the time, Church's was a publicly held corporation with approximately thirty-six million outstanding shares traded on the New York Stock Exchange.

2. The "poison pill" granted shareholders of record on November 4, 1988 one "right" per share of common stock they held. Among other things, the right entitled its holder to purchase additional shares of Church's stock at heavily discounted prices upon certain triggering events, including the acquisition by one shareholder of thirty percent or more of the outstanding stock of the company.

3. The complex history of this related litigation for the most part is beyond the scope of this appeal. It included, among other things, a class action filed in Texas state court against the directors on behalf of some of Church's shareholders, *Piro, et al v. Bamberger, et al.*, No. 88–CA–19608, 285th Judicial District, Bexar County, Texas, and litigation between Copeland and the directors in the Eastern District of Louisiana and in the Western District of Texas.

class of all Church's shareholders and also asked the court's permission to proceed derivatively. She prayed, among other things, for injunctive relief facilitating the acquisition of Church's in a change-of-control tender, and for attorneys' fees. On December 28, 1988, O'Neill moved the court to grant a preliminary injunction forcing the board to remove the poison pill blocking Biscuit's takeover attempt.[4]

The directors announced on January 18, 1989 their decision that a sale of Church's would be in the best interests of the shareholders. They announced a thirty-day "auction" of Church's to be concluded on February 18, 1989, the day before Biscuit's tender offer was due to expire. In an order initially issued on February 9, 1989 and amended on February 24, the district court concluded that O'Neill had standing to proceed derivatively on behalf of Church's,[5] and denied her request for a preliminary injunction forcing the directors to remove the poison pill. *See A. Copeland Enterprises, Inc. v. Guste,* 706 F.Supp. 1283, 1288 (W.D.Tex.1989).[6] The court suggested, however, that it would enter such an injunction if the poison pill were not removed at the close of the auction to facilitate a sale of Church's to the highest bidder. *Id.* at 1293.

Subsequently, it became unnecessary for the district court to enforce this threat. On February 15, 1989, three days prior to the expiration of the auction deadline, Biscuit tendered a revised bid essentially amounting to eleven dollars per share cash for all outstanding Church's shares, which the directors approved (and eliminated the poison pill, as required by the offer). The tender was completed on March 21, 1989,

rendering moot O'Neill's derivative action. On that day, Biscuit mailed payments directly to all Church's shareholders and the former directors of Church's resigned.

On March 17, 1989, just prior to the final consummation of the tender, O'Neill petitioned the district court to award her attorneys' fees against Church's in the amount of $4,000,000 plus expenses. The district court ultimately granted her petition and awarded her $412,477.71 for fees and expenses. Church's filed timely notice of appeal.

### Discussion

The prevailing "American Rule" provides that a successful litigant generally cannot collect attorneys' fees against the loser. *E.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). Equity, however, traditionally allowed parties creating or preserving a fund for the benefit of others to recover their attorneys' fees from the fund itself or directly from the other beneficiaries. *Id.* at 1621. In keeping with this prevailing rule, Texas law[7] allows shareholders who pursue a successful derivative suit to recover their attorneys' fees from the corporation if they show that they have conferred a substantial benefit to the corporation through their efforts. *E.g., Modern Optics, Inc. v. Buck,* 336 S.W.2d 857, 861 (Tex.Civ.App.—Waco 1960, writ ref'd n.r.e.); *accord Adler v. Brooks,* 375 S.W.2d 544, 547 (Tex.Civ.App.—Tyler 1964, writ ref'd n.r.e.).

In this case, the shareholder action was made moot by the decision of the board to approve Biscuit's revised tender offer of February 15. The district court followed

---

**4.** Biscuit requested similar relief in its own action against the directors. *See note 3, supra.*

**5.** Standing to pursue a derivative action requires that the proposed plaintiff be a shareholder, that she adequately represent the interests of the shareholders, and that she plead with particularity her efforts to have the suit brought for the corporation by the board of directors. *See* Tex.Bus.Corp. Act art. 5.14 B (1980); Fed.R.Civ.P. 23.1 (1990).

Although the district court found that O'Neill had satisfied these prerequisites and granted

permission for O'Neill to pursue the derivative action, it never acted on her motion for class certification.

**6.** The order disposed of O'Neill's motion for injunctive relief and of the similar motion filed by Biscuit in its separate action against the directors, which had been consolidated with O'Neill's action for this purpose. *See id.* at 1285.

**7.** The parties do not dispute on appeal that Texas law governs this claim.

the principle established in the Delaware courts [8] that in such circumstances the burden is on the corporation to show that there was no causal connection between the shareholder's action and the decision of the directors to approve Biscuit's offer. *See Barton v. Drummond Co.*, 636 F.2d 978, 984–85 (5th Cir.1981) (applying Delaware law). The district court accordingly found that O'Neill was entitled to attorneys' fees. It found that O'Neill's prosecution of her suit affected the court's rulings, and that those rulings affected the decision of the directors to approve Biscuit's revised tender offer at eleven dollars per share. That sale, the district court found, "by increasing the value of Church's stock, obviously conferred a substantial benefit upon Church's and its shareholders."

Church's does not claim on appeal that the award of fees was excessive, nor does it contest the court's finding that O'Neill's suit contributed to the increase in the tender price.[9] Church's sole contention on appeal is that the district court was clearly erroneous in finding that this increased tender price conferred a substantial benefit on the *corporation* as opposed to the individual shareholders who accepted the offer. Church's concedes that the increase in the sale price of Church's stock benefited these shareholders, and seems to concede that O'Neill's prosecution of her lawsuit would justify a judgment for fees against the selling shareholders on a common benefit theory.

The corporation points out, however, that Biscuit, the current owner of the company, did not receive any benefit from O'Neill's derivative action. Quite to the contrary, insofar as O'Neill's action drove up the price of stock, Biscuit was directly injured by being forced to pay a *higher* price to acquire the stock. It would be inequitable and contrary to the rule, Church's argues, to force the current owner of the company to pay for a "common benefit" received by its prior owners.

The district court relied to the contrary on *Prudential–Bache Secs., Inc. v. Mat-*

*thews,* 627 F.Supp. 622, 625 (S.D.Tex.1986). That case involved similar claims of director entrenchment, and in it a shareholder derivative action was found to have contributed to a decision by the defendant board of directors to approve on behalf of the corporation a favorable stock tender offer. The court awarded attorneys' fees against the corporation despite its new ownership. *Prudential–Bache* does not discuss or attempt to reconcile, however, the incongruity of this result with the traditional purposes of the "common benefit" rule, *i.e.,* to shift the legal costs of acquiring the common benefit to those who received it. Church's urges that *Prudential–Bache* is wrongly decided, relying on our decision in *Junker v. Crory,* 650 F.2d 1349 (5th Cir.1981), and the decision of the Second Circuit in *Christensen v. Kiewit–Murdock Inv. Corp.,* 815 F.2d 206, 211 (2d Cir.), *cert. denied,* 484 U.S. 908, 108 S.Ct. 250, 98 L.Ed.2d 209 (1987).

In *Junker,* a minority shareholder in a closely held corporation brought an action individually and derivatively against the directors for breach of fiduciary duty to the shareholder and corporation in connection with a merger plan. All shareholders other than the plaintiff were defendants. The district court rendered judgment in favor of the minority shareholder individually and derivatively. By the time of the award, however, the corporation had ceased to exist, and no shareholder besides the plaintiff benefited from the judgment because all other shareholders were defendants. As such, this court held on appeal that the action was "derivative" in name only and found no basis for an attorneys' fee award. *Junker,* 650 F.2d at 1363.

*Christensen* involved a class action by shareholders holding certain classes of stock who claimed they were adversely affected by a merger agreement proposed by the defendant board of directors. After the class action was filed, the board announced a revised merger plan that dealt with the plaintiff class of shareholders

---

**8.** Church's does not challenge the applicability of this rule under Texas law.

**9.** We therefore express no opinion on these matters.

more favorably. The *Christensen* court denied the class representatives in that case any fee award against the corporation on the ground that any benefit the class action caused had accrued only to its class members, not to the corporation itself or to its shareholders in general. Because all classes of shareholders were not equally affected, the court observed, taxing costs to the corporation would not act as a conduit for shifting fees to the beneficiary class. *Christensen*, 815 F.2d at 210–12.

Neither *Christensen* nor *Junker* is directly on point because, in contrast to the action in either of those cases, O'Neill's lawsuit was properly brought as a derivative claim. The leading Delaware cases suggest that when a share purchase is inevitable, the directors' duty of loyalty to shareholders transforms the board's role from "defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Revlon, Inc. v. MacAndrews & Forbes Holdings*, 506 A.2d 173, 182 (Del. 1985). Any misconduct on the part of the directors in reacting to a tender for all the corporation's stock will harm all stockholders, as such, in proportion to their share of ownership. Thus, it has been recognized that an action such as O'Neill's must be brought as a derivative claim. *E.g., Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1069–71 (Del.Ch.), *aff'd*, 500 A.2d 1346 (Del. 1985). To say that the claim is derivative implies that it belongs to the corporation.

Because Church's does not challenge the causal connection between O'Neill's derivative action and the increased tender price, we cannot conclude that the district court's findings were clearly erroneous. The increased price per share in the tender offer was a benefit enjoyed equally by all shareholders, solely in their capacities as such, in proportion to their share of ownership in the corporation. In the context of such a tender offer, this benefit of the derivative action may therefore be deemed to have accrued to the corporation; and the corporation accordingly is properly made subject to a claim for attorneys' fees by the shareholder whose derivative action on its behalf brings about the benefit.

Admittedly, this result in some respects appears to contravene the traditional purpose of the common benefit rule. Rather than taxing O'Neill's fees to the prior shareholders who benefited from the higher price her action allegedly prompted, as a practical matter our decision seems to tax those fees to the present shareholder, who was forced to pay the higher price and obviously enjoyed no benefit. This analysis, however, ignores the fact that any purchaser of a corporation also purchases that corporation's liabilities, whether unliquidated, disputed, or even unforeseen. That O'Neill was incurring attorneys' fees in her derivative action on behalf of Church's was hardly a surprise to Biscuit, which was itself actively involved in related litigation that had at times been consolidated with O'Neill's action, at least for certain limited purposes. The burden may properly be placed on the offerer to account for the cost of such potential fee awards in the calculation of his tender offer, or to make other arrangements to shift the cost of fees to the shareholders to whom the tender offer is made.[10] And, if the offerer does so, this will have the effect of causing the benefited shareholders, as such, to ratably bear the cost of prosecuting the derivative suit which produced the benefit. Moreover, as a practical matter, there is no other reasonably available means to allow O'Neill to recover her expenses in producing the common benefit that Church's in essence concedes her derivative action has bestowed.[11]

---

**10.** For example, Biscuit could have structured its tender offer to pay a certain percentage of the purchase price into escrow to cover any such attorneys' fees award that might be made to O'Neill in her derivative suit, with any excess to be ratably distributed to the shareholders. Doubtless there are several other alternatives which could produce the same result.

**11.** Church's suggests that O'Neill's appropriate remedy was to seek injunctive relief against Biscuit (presumably after joining Biscuit as an additional defendant in her action against Church's), for the purpose of *forcing* Biscuit to withhold a portion of the purchase price paid to shareholders for payment into an escrow account for attorneys' fees. Assuming that this

## Conclusion

For the foregoing reasons, the district court's judgment is

AFFIRMED.

means of relief was theoretically available, we disagree that it offers a practical solution to O'Neill's problem, given the unwieldy nature of the process proposed and the characteristically rapid pace at which these transactions tend to occur. Moreover, if O'Neill could succeed in such an action—*i.e.*, could *force* Biscuit to establish such an escrow—there seems little reason not to charge Biscuit with the risk of not having done so voluntarily. The hypothetical injunction suit would, of course, give Biscuit more notice of the fee risk, but under the circumstances we believe it was adequately charged with that notice anyway.

Almost as an afterthought, Church's suggests that its former directors might be held accountable for O'Neill's attorneys' fees. The basis for this claim appears to be the mere fact that O'Neill alleged breach of fiduciary duty by these directors in their initial opposition to Biscuit's tender offer. As Church's concedes, however, the breach of duty allegations were mooted by the revised tender offer and acceptance, and never reached adjudication on the merits in the court below. Church's offers no authority in support of this novel approach, and we find no basis in law or equity for such an award here. It would not be an award on a common benefit theory.